AO 91 (Rev. 11/11)  Criminal Complaint

FILED
CLERK, U.S. DISTRICT COURT

DEC – 5 2019

CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION      BY DEPUTY

COPY

# UNITED STATES DISTRICT COURT

for the

Central District of California

United States of America

v.

CRAIG CURTIS HARRIS,

Defendant(s)

Case No. **LA19-5173M**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of December 5, 2019, in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with Intent Distribute |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/
_____
*Complainant's signature*

Gregory A. Hafer, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 12/5/19

/s/  Wilner
_____
*Judge's signature*

City and state:  Los Angeles, California

Hon. Michael R. Wilner, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT**

I, Gregory A. Hafer, being duly sworn, declare and state as
follows:

## I.  PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal
complaint against CRAIG HARRIS ("HARRIS") for a violation of 21
U.S.C. § 841(a)(1): Possession with Intent to Distribute a
Controlled Substance.

2.    This affidavit is also made in support of an
application for a warrant to search the 618 East Fairview
Boulevard, Inglewood, California (the "SUBJECT PREMISES") as
described more fully in Attachment A-1, and an application for a
warrant to search a iPhone X in a black Otterbox case seized on
December 5, 2019 and currently in the custody of the Federal
Bureau of Investigation and San Bernardino County Sheriff's
Department in Colton, California (the "SUBJECT DEVICE"), as
described more fully in Attachment A-2.

3.    The requested search warrants seek authorization to
seize evidence, fruits, or instrumentalities of violations of 21
U.S.C. § 841(a)(1) (possession with intent to distribute
controlled substances) and 21 U.S.C. § 846 (conspiracy and
attempt to distribute controlled substances) (the "Subject
Offenses"), as described more fully in Attachments B-1 and B-2.
Attachments A-1, A-2, B-1, and B-2 are incorporated herein by
reference.

4.    The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and

information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. **BACKGROUND OF AFFIANT**

5.   I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been so employed since January 2018.  I am currently assigned to the FBI Los Angeles Field Office, Riverside Resident Agency, where I conduct violent crime investigations.  I have completed the 20-week training program given by the FBI, which includes instruction in the investigation of various criminal offenses governed by federal law.  I have received training in the enforcement of the laws of the United States, including training in the preparation, presentation, service, and execution of criminal complaints and arrest and search warrants.

6.   During the course of my employment, I have participated in drug trafficking investigations concerning the unlawful importation, possession, and distribution of controlled substances.  I have also received training in the investigation of drug trafficking organizations and on the patterns and procedures through which drug trafficking organizations conduct their illegal business.  Based on my training, experience, and

participation in drug trafficking investigations and upon my consultation with other experienced law enforcement officers, I have become familiar with drug trafficking and distribution methods.

### III. SUMMARY OF PROBABLE CAUSE

7.   On October 9, 2019, Jerome Hill ("Hill") sold an FBI Confidential Informant (the "CI")[1] approximately 51 round pills stamped with "A 215." One of those pills was later tested by a laboratory and tested positive for fentanyl. On November 6, 2019, Hill told the CI that he had to meet with his supplier in West Covina. Law enforcement saw Hill meet with HARRIS in West Covina and, later that day, Hill sold the CI 1,000 suspected fentanyl pills also stamped "A 215."

8.   On December 5, 2019, approximately 26 minutes after Hill told the CI that his supplier could fulfill the order for 10,000 fentanyl pills, HARRIS went to the garage of the SUBJECT PREMISES and left carrying a box and something that resembled rolled up papers that he threw in the trash can across the sidewalk from the SUBJECT PREMISES. Law enforcement later looked in the trash can and saw multiple white cardboard United States Postal Service ("USPS") envelopes. Later that day, at 10:48 a.m., Hill sent HARRIS a photograph of the money that the CI had sent Hill for the pills. Call records show that HARRIS

---

[1] The CI has been an informant with the FBI since October 2018. The CI has given credible information in the past and has assisted in an investigation into a violent criminal street gang. The CI has felony convictions for possession of a controlled substance for sale and conspiracy. The CI is currently working for immigration benefits and financial gain.

and Hill called each other at 10:51 a.m., 11:13 a.m., and 11:19 a.m. At approximately 11:36 a.m., HARRIS went to the SUBJECT PREMISES, left with something obscured, and drove directly to meet Hill at the prearranged location for the drug deal. When law enforcement tried to stop HARRIS in his car, HARRIS threw out of his car two white flat USPS cardboard envelopes resembling the white cardboard USPS envelopes found in the trash can in front of the SUBJECT PREMISES. Those envelopes contained approximately 10,000 suspected fentanyl pills also stamped "A 215." Hill and HARRIS were arrested. Law enforcement found the SUBJECT DEVICE in the car that HARRIS was driving.

## IV. STATEMENT OF PROBABLE CAUSE

9. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

### A.   Background - The Hill Complaint

10. On December 4, 2019, the Honorable Sheri Pym, United States Magistrate Judge authorized a complaint and arrest warrant for Hill for a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance. The underlying affidavit for the complaint is attached hereto as Exhibit 1, incorporated herein by reference, and referred to in this affidavit as the "Hill Complaint."

11. As described in greater detail in the Hill Complaint. On October 9, 2019, Hill sold the CI approximately 51 round pills stamped with "A 215." One of those pills was later tested by a laboratory and tested positive for fentanyl.

12.   Also described in further detail in the Hill Complaint, on November 6, 2019, Hill met with HARRIS prior to selling the CI 1,000 fentanyl pills.  Specifically, Hill agreed to sell the CI 1,000 fentanyl pills and said that he had to go to West Covina to meet with his supplier before Hill could deliver the pills.  Law enforcement followed Hill to West Covina and saw him meet with HARRIS, as confirmed by a comparison with HARRIS's California Department of Motor Vehicle photograph. Hill and HARRIS met for approximately 15 minutes, but were standing between their two vehicles, so surveillance units were unable to see whether they exchanged any items.  Based on GPS information from the tracker on Hill's vehicle and data from Hill's phone, the vehicle and phone went from West Covina to Hill's residence and did not leave until Hill went to meet the CI a couple of hours later.  At that meeting, Hill sold the CI 1,000 pills of suspected fentanyl, also stamped with "A 215," for $8,000.  Lab results for the 1,000 pills are pending.

    **B.   HARRIS Picked up Items from the SUBJECT PREMISES and met Hill at the Prearranged Location for a Drug Deal.**

13.   On December 5, 2019, at approximately 8:29 a.m., at the direction of investigators, the CI placed a recorded call to Hill.  During the call, the CI asked to buy 10,000 pills from Hill, to be delivered that same day.  Hill agreed to sell the CI 10,000 pills and said that he would call his supplier to confirm.  At approximately 8:34 a.m., Hill called the CI and confirmed that his supplier could fulfill the order of 10,000

pills.   The CI and Hill also discussed the logistics for completing the transaction.

14.   Before initiating the CI's call to Hill, investigators set up surveillance on HARRIS.   At approximately 9:00 a.m., law enforcement saw HARRIS arrive in front of the SUBJECT PREMISES driving a white Chevrolet Volt bearing California license plate 8KFU421 and registered to HARRIS (the "Volt").   Investigators saw HARRIS open the garage of the SUBJECT PREMISES and meet with unknown individuals inside the SUBJECT PREMISES.   HARRIS retrieved a box from the SUBJECT PREMISES, and placed it into the Volt.   Law enforcement surveillance also saw HARRIS leave the SUBJECT PREMISES with what they initially thought could be rolled up papers and throw those papers into the trash can across the sidewalk from the SUBJECT PREMISES.   Law enforcement later looked in that trash can and saw rolled up white cardboard USPS envelopes.

15.   Surveillance units continued to follow HARRIS to multiple locations and pick up a passenger prior to HARRIS ultimately arriving at his residence at approximately 10:41 a.m. Approximately 20 minutes later, HARRIS left his residence alone and empty-handed and departed in his Volt.

16.   As described in greater detail below, law enforcement later recovered Hill's phone and saw his messages with "Craig," which is HARRIS's first name.   On December 5, 2019, at 10:48 a.m., Hill sent HARRIS a photograph of the money that the CI had sent Hill for the pills.   Call records from Hill's phone show

that HARRIS and Hill called each other at 10:51 a.m., 11:13 a.m., and 11:19 a.m.

17.   Meanwhile, at approximately 11:16 a.m., the CI called HILL's telephone, and HILL agreed to complete the transaction with the CI in one to two hours.

18.   At approximately 11:36 a.m., surveillance units saw the Volt parked near the SUBJECT PREMISES.  Investigators saw HARRIS leave the SUBJECT PREMISES with something obscured and get into the Volt.

19.   Surveillance units followed HARRIS from the SUBJECT PREMISES directly to the parking lot of a restaurant located across the street from the Home Deport where Hill and CI had conducted their previous transactions and where Hill and the CI had agreed to conduct this transaction for 10,000 fentanyl pills.  HARRIS and Hill spoke briefly in between their vehicles before Hill went back into his vehicle and called the CI to ask about the CI's location.  At that point, the CI called off the deal.  Law enforcement saw that Hill then briefly spoke with HARRIS again and the two left in their respective cars.

### C.   HARRIS Threw Two Packages of Suspected Fentanyl Pills and had the SUBJECT DEVICE in his Car

20.   At approximately 1:30 p.m., investigators attempted to conduct a traffic stop on HARRIS's Volt.  HARRIS failed to yield to investigators and proceeded onto the freeway on-ramp.  An investigator saw two items thrown outside the vehicle as HARRIS continued to drive on the freeway.  Shortly thereafter, HARRIS

yielded to investigators without further incident.   HARRIS was the only person in the Volt.

21.   Law enforcement recovered the two items thrown from the Volt and saw that they were white cardboard USPS envelopes consistent in appearance with the envelopes recovered from the trash outside of the SUBJECT PREMISES.   The two envelopes each contained two large vacuum-sealed bags containing a large quantity of light blue pills stamped with "A 215."   Law enforcement who have viewed the contents of the envelopes estimated that it is likely that there are approximately 10,000 pills in total.   Because of the dangers of fentanyl, a synthetic opioid that can be fatal to the touch even in small quantities, law enforcement has not conducted a field test of suspected fentanyl pills.   I believe that the pills contain fentanyl or another controlled substance, however, because these pills are consistent with the pills obtained during the two previous transactions between the CI and HILL, the one pill that was tested in the first deal tested positive for fentanyl, and the negotiated price for the pills is consistent with the price of fentanyl pills.

22.   Based on the foregoing, I believe that the SUBJECT PREMISES is a stash house used by multiple individuals to store and make narcotics.   I based this on the timing of HARRIS going to the SUBJECT PREMISES to pick up what was likely the fentanyl pills immediately before driving directly to the prearranged drug deal location, and on the packaging of the pills resembling the packaging found in the trash can outside of the SUBJECT

PREMISES.  I know, based on my training and experience, that, in order to protect valuable drugs and drug proceeds at a stash house, drug traffickers do not permit those who are uninvolved in the drug business to be at the stash house.

23.  Law enforcement found the SUBJECT DEVICE in the center console of the Volt and saw that HARRIS appeared to be using Bluetooth to communicate on the SUBJECT DEVICE when we was pulled over.

24.  Law enforcement also arrested Hill, recovered Hill's phone, and searched Hill's phone pursuant to a federal search warrant authorized by Judge Pym.  That search led to the messages between Hill and HARRIS described above.

25.  After HARRIS was detained, investigators conducted a freezing of the SUBJECT PREMISES to prevent destruction of evidence and a safety sweep pending a search warrant.  I do not rely on anything that may have been seen during the freezing and sweep of the location.

## V.  TRAINING AND EXPERIENCE ON DRUG OFFENSES

26.  Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.  Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their

illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in "stash houses," or locations used for drug packaging and trafficking.

c.   Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residence.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residence, including in the form of calendar entries and location data.

e.   Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis.  Such currency is often stored in their residences and at stash houses.

f.   Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence, in stash houses, or in safes.  They also often keep other items related to their drug trafficking activities at their residence and in stash houses such as digital scales, packaging materials, and proceeds of drug trafficking.  These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence or stash house even if the drug trafficker lives with others who may be unaware of his criminal activity.

g.   It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[2]

27. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents,

---

[2] As used herein, the term "digital device" includes the SUBJECT DEVICE and any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

28.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

29.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. CONCLUSION

30.  For all of the reasons described above, there is probable cause to believe that CRAIG HARRIS has committed a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance, and that evidence of the Subject Offenses described in Attachment B-1 will be found in a search of the SUBJECT PREMISES described in Attachment A-1 and that evidence of the Subject Offenses described in Attachment

B-2 will be found in a search of the SUBJECT DEVICE described in Attachment A-2.

_____
/s/
Gregory A. Hafer, Special
Agent
Federal Bureau of
Investigation

Subscribed to and sworn before me
This  5  day of December, 2019.

_____
/s/
HONORABLE MICHAEL R. WILNER
UNITED STATES MAGISTRATE JUDGE

15

EXHIBIT 1

<u>AFFIDAVIT</u>

I, Lisa T. Boylan, being duly sworn, declare and state as follows:

I.  <u>PURPOSE OF AFFIDAVIT</u>

1.    This affidavit is made in support of a criminal complaint and arrest warrant against Jerome Hill ("HILL") for a violation of 21 U.S.C. § 841(a)(1): Distribution of a Controlled Substance.

2.    This affidavit is also made in support of an application for a warrant to search a silver 2018 Toyota Prius with California License Plate 8FPV059 and vehicle identification number JTDKARFP4J3079008 (the "SUBJECT VEHICLE") as described more fully in Attachment A-1, and the person of HILL as described more fully in Attachment A-2.

3.    The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (distribution of controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A-1, A-2, and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrants, and does not purport to set forth

all of my knowledge of or investigation into this matter.
Unless specifically indicated otherwise, all conversations and
statements described in this affidavit are related in substance
and in part only.

## II. BACKGROUND OF AFFIANT

5.    I am a Special Agent with the Federal Bureau of
Investigation ("FBI"), and have been so employed since
September 2017.  I am currently assigned to the FBI Los Angeles
Field Office, Riverside Resident Agency.  I am currently
assigned to the Inland Empire Hybrid Drug Task Force
("IEHTF").  This task force consists of experienced drug
investigators from the FBI, Drug Enforcement Administration
("DEA"), Homeland Security Investigations, Ontario Police
Department, and the San Bernardino County Sheriff's Department
("SBSD").

6.    I have completed the 23-week training program given by
the FBI, which includes instruction in the investigation of
various criminal offenses governed by federal law.  I have
received training in the enforcement of the laws of the United
States, including training in the preparation, presentation,
service, and execution of criminal complaints and arrest and
search warrants.  In connection with my employment with the FBI,
I have participated in multiple investigations in which I have
used a variety of investigative techniques, including
interviewing suspects and witnesses, speaking with law
enforcement agents and officers, conducting and reviewing
electronic surveillance, executing arrest and search warrants,

analyzing telephone records, and collecting and reviewing physical evidence. As a result of this experience and my conversations with other law enforcement personnel with substantial experience, I am familiar with the methods used by drug trafficking organizations.

7.    Prior to entering into service with the FBI, I was a Special Agent with the DEA for approximately two and a half years. During my employment with the DEA, I completed 18 weeks of training related to techniques used by narcotics traffickers and served as a case agent and co-case agent on investigations into large-scale narcotics traffickers.

### III. SUMMARY OF PROBABLE CAUSE

8.    In October 2019, HILL, using the phone number (909) 260-5902 (the "SUBJECT TELEPHONE") arranged to sell fentanyl pills to an FBI Confidential Informant ("CI"). On October 9, 2019, HILL drove the SUBJECT VEHICLE to meet the CI and provided the CI with approximately 51 round pills stamped with "A 215." One of those pills was later tested by the SBSD laboratory and tested positive for fentanyl. On November 6, 2019, HILL, again using the SUBJECT TELEPHONE, agreed to sell the CI 1,000 fentanyl pills. Later that day, HILL drove the SUBJECT VEHICLE to meet the CI and, at that meeting, sold the CI 1,000 pills of suspected fentanyl, also stamped with "A 215," for $8,000. Lab results for the 1,000 pills are pending. On December 2, 2019, HILL again used the SUBJECT TELEPHONE to contact the CI to conduct another drug deal.

Case 5:20-cr-00001-MWF   Document 1   Filed 12/05/19   Page 21 of 35   Page ID #:21
Case 5:19-mj-00651-DUTY *SEALED*   Document 1 *SEALED*   Filed 12/04/19   Page 5 of 29
Page ID #:5

## IV. STATEMENT OF PROBABLE CAUSE

9.    Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.    Background**

10.    In October 2019, the CI[1] notified me that he/she had been contacted approximately a month earlier by a prior associate that he/she knew as "Jay," who asked whether the CI could find a buyer for pills.  "Jay" told the CI in an unrecorded conversation that he was selling pills that were being manufactured in a lab in Los Angeles by a "Mexican guy." "Jay" further explained that the pills were potent and suggested taking only a portion of each pill at one time because ingesting an entire pill could be deadly.

11.    The CI provided an address and the SUBJECT TELEPHONE for "Jay."  Based on a search of law enforcement databases, California Department of Motor Vehicle ("DMV") records, and open-source databases, investigators identified HILL as a person associated with that address and the SUBJECT TELEPHONE.  Upon showing the CI a California DMV photograph of HILL, the CI confirmed that the person in photograph was "Jay."  According to the CI, the CI had met HILL in 2018, and previously supplied

---

[1] The CI has been an informant with the FBI since October 2018.  The CI has given credible information in the past and has assisted in an investigation into a violent criminal street gang.  The CI has convictions for felony possession of a controlled substance for sale and felony conspiracy to commit a crime.  The CI is currently working for immigration benefits and financial gain.

HILL with marijuana.  The CI also purchased large quantities of vape pens from HILL for resale to the CI's customers.

12.  On October 3, 2019, the CI placed a recorded call to HILL at the SUBJECT TELEPHONE.  On that call, HILL stated that he would provide the CI with a sample of pills that were 30 milligrams each..  HILL stated the pills were stamped with "A 215" and that HILL's supplier sold the pills to HILL for $7 per pill, so HILL would sell them to the CI for $8 per pill.

13.  HILL communicated with the CI using an end-to-end telephone encryption application called Signal.  All calls, text messages, video chats, and pictures sent/made within the Signal application are encrypted and cannot be intercepted.  The telephone number associated with a Signal account matches the telephone number assigned to the device Signal is installed on. If the telephone number of the device changes, the user will also have to change the telephone number of the Signal account to match that of the device.  For each recorded call in this affidavit, I confirmed that the CI used the Signal application to call HILL on the SUBJECT TELEPHONE and I monitored the call contemporaneously.

14.  On October 8, 2019, at the direction of the FBI, the CI placed another recorded call to the SUBJECT TELEPHONE.  In that call, HILL agreed to provide the CI with sample pills the following day.  On October 9, 2019, HILL confirmed in another recorded call that he would meet the CI later that afternoon to drop off the sample pills.

B.  HILL Provides the CI with a sample of fentanyl pills

15.  On October 9, 2019, at approximately 1:30 p.m., IEHTF investigators established surveillance in the area of the agreed-upon meeting location, a Home Depot parking lot located at 16005 Sierra Lakes Parkway, Fontana, California.  Prior to the controlled meeting, IEHTF members searched the CI and the CI's vehicle for contraband with negative results. Investigators then followed the CI to the Home Depot.  The CI had an audio-video recording device and transmitter contemporaneously monitored by law enforcement.  At approximately 1:54 p.m., the CI placed a recorded phone call to the SUBJECT TELEPHONE and informed HILL where the CI was parked.

16.  At approximately 2:04 p.m., IEHTF investigators saw the SUBJECT VEHICLE enter the Home Depot parking and then park next to the CI's vehicle.  A search of the DMV database revealed that the SUBJECT VEHICLE's license plate, California license plate 8FPV059, is associated with a 2018 Toyota Prius registered to Latricia M. Fleekshill at the same address associated with the SUBJECT TELEPHONE and DMV records for HILL.

17.  A black male matching HILL's appearance as I recognized based on my review of his DMV photograph, exited the driver's seat of the SUBJECT VEHICLE and appeared to retrieve something from the trunk.  After closing the trunk, HILL entered the front passenger side of the CI's vehicle.

18.  During a post-operational debrief, the CI stated that HILL placed a white envelope on the car's center console.  The CI asked how much time HILL would need to fulfill a large pill

order.   HILL stated he would be able to get the pills the same
day depending on the location of the "paper."   Based on my
training and experience, I know drug traffickers commonly use
the term "paper" as coded language for money.   The meeting ended
with the CI telling HILL that the pills would be distributed to
prospective customers and that the CI would contact HILL if a
buyer was located.   The CI's audio-video recorder corroborated
the CI's description of the conversation inside the CI's car.

19.   At approximately 2:15 p.m., investigators saw HILL
exit the CI's vehicle and then drive onto California Interstate
210 in the SUBJECT VEHICLE.

20.   Investigators followed the CI from the Home Depot to a
pre-determined location.   The white envelope that HILL left in
the CI's car contained a purple pill bottle with 51 round pills
stamped with "A 215."   This resembled the purple pill container
in a photograph from HILL that the CI showed me during our
October 3, 2019 meeting.

21.   The envelope and its contents were collected and sent
to the SBSD Scientific Investigations Division for presumptive
testing.   The SBSD laboratory tested one pill for fentanyl, and
the pill was destroyed during testing.   On October 15, 2019, the
SBSD laboratory reported that the pill tested positive for
fentanyl.   On October 16, 2019, the remaining 50 pills from the
purple container were delivered to the DEA laboratory for a more
detailed analysis.   Those results are pending.

C.   HILL Sells 1,000 Fentanyl Pills to the CI

22. At approximately 8:18 a.m. on the morning of
November 6, 2019, at the direction of investigators, the CI
called the SUBJECT TELEPHONE and asked if HILL had enough for a
"thousand pack," meaning the CI was asking if HILL could obtain
1,000 pills, to be delivered later that same day.  HILL said he
would call his supplier and ask.  Approximately six minutes
later, the CI received a call from HILL asking what time the CI
would be able to meet up.  HILL said he had to go to West Covina
to meet with his supplier before HILL could deliver pills.

23. From approximately 8:40 a.m. to 9:51 a.m., with the
aid of GPS data from the SUBJECT TELEPHONE and a tracker on the
SUBJECT VEHICLE,[2] surveillance units followed HILL approximately
57 miles to a mall parking lot in West Covina, California.
After HILL parked the SUBJECT VEHICLE, surveillance units saw a
white 2016 Chevrolet pick-up, with California license plate
75724Z1 and Vehicle Identification Number ("VIN")
3GCPCTEC2GG223088, arrive and park next to HILL.  An older male,
later identified as Craig Curtis Harris ("HARRIS") based on a
comparison to HARRIS's California DMV photograph, exited the
truck and spoke with HILL for approximately 15 minutes before

───────────────

[2] On **Error! Main Document Only.**October 22, 2019, the
Honorable Sheri Pym, United States Magistrate Judge, signed
warrants in case numbers 5:19-MJ-00569 and 5:19-MJ-00570,
authorizing, respectively, the collection of cell-site data from
the SUBJECT TELEPHONE and the installation and use of a tracking
device on the SUBJECT VEHICLE.  On December 2, 2019, Judge Pym
signed a warrant authorizing the continued use of a tracking
device on the SUBJECT VEHICLE, and, on December 3, 2019, Judge
Pym signed a warrant authorizing the continued collection of
cell-site data from the SUBJECT TELEPHONE.

Case 5:19-mj-00651-DUTY *SEALED*   Document 1 *SEALED*   Filed 12/04/19   Page 10 of 29
Page ID #:10

both men returned to their respective vehicles and drove away.
HARRIS and HILL were standing between their two vehicles and
surveillance units were unable to observe whether they exchanged
any items.

24.   Because investigators believed HARRIS was HILL's
narcotics supplier, surveillance units followed HARRIS after he
left the meeting location.   Surveillance units followed HARRIS
for approximately three and one-half hours, during which time
HARRIS stopped at 3501 South Cochran Avenue, Los Angeles,
California, the address listed on HARRIS's DMV records as well
as the truck's registration.

25.   Based on GPS information from both the tracker on the
SUBJECT VEHICLE and data from the SUBJECT TELEPHONE, HILL went
from that meeting with HARRIS in West Covina, to his residence.
Neither the SUBJECT VEHICLE nor the SUBJECT TELEPHONE left
HILL's residence until he left to meet with the CI.

26.   At approximately 11:30 a.m., investigators established
surveillance near the same Home Depot parking lot as the CI and
HILL's first transaction.   At the direction of investigators,
the CI made a recorded call to HILL on the SUBJECT TELEPHONE
arranging a meet time.   HILL advised he would meet the CI in
approximately 20 minutes at the Home Depot.

27.   Prior to the controlled meeting, investigators
searched the CI and the CI's vehicle for contraband with
negative results.   Investigators then provided the CI with
$8,000 and followed the CI to the Home Depot.   The CI had an

audio-video recording device and transmitter which was contemporaneously monitored by law enforcement.

28.   HILL arrived at approximately 12:23 p.m. in the SUBJECT VEHICLE, and parked next to the CI's car.  HILL got out and spoke to the CI through the passenger side window of the CI's car.  HILL retrieved a box from his trunk and placed it in the CI's trunk.  HILL closed both trunks and entered the front passenger seat of the CI's vehicle.

29.   During a post-operational debrief, the CI advised that he/she removed $8,000 from his/her pocket and placed it in the cup holder in the center console.  As HILL entered the CI's vehicle, the CI handed the $8,000 to HILL, who took the money, placed it in his right-hand pants pocket, and stated that he did not need to count it since the CI said it was $8,000.  The CI asked HILL if HILL could obtain a larger amount of pills.  HILL replied yes, "like ten thousand."  The CI's audio-video recorder corroborated these events.

30.   Investigators followed the CI from the Home Depot to a pre-determined location.  In the CI's trunk, they found a brown box containing a second, smaller box, which in turn contained a small, white paper bag.  In the paper bag were two bottles containing a large number of pills stamped with "A 215."

31.   On November 7, 2019, investigators sent the two pill bottles along with their contents to the DEA Laboratory in Vista, California for testing.  These results are pending.

D.   **HILL Inquires About Future Drug Transactions**

32.   On December 2, 2019, HILL contacted the CI using the
SUBJECT TELEPHONE.   HILL told the CI that he wanted to "make
some money," and asked the CI what was going on with his/her
buyer.   Based on my training and experience, I believe HILL
wanted to know whether the CI's buyer would purchase additional
fentanyl pills.   This call was recorded by the CI.   The CI
responded that his/her buyer should be back in town any day now
and that the buyer previously stated he wanted another order
after the Thanksgiving holiday.

33.   Based on HILL's recent communications, investigators
intend to have the CI arrange a third controlled transaction for
a larger quantity of fentanyl pills on or about December 5,
2019.

## V.   TRAINING AND EXPERIENCE ON DRUG OFFENSES

34.   Based on my training and experience and familiarity
with investigations into drug trafficking conducted by other law
enforcement agents, I know the following:

a.   Drug trafficking is a business that involves
numerous co-conspirators, from lower-level dealers to higher-
level suppliers, as well as associates to process, package, and
deliver the drugs and launder the drug proceeds.   Drug
traffickers often travel by car, bus, train, or airplane, both
domestically and to foreign countries, in connection with their
illegal activities in order to meet with co-conspirators,
conduct drug transactions, and transport drugs or drug proceeds.

     b.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in their vehicles and on their person.

     c.   Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

     d.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residence.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their vehicles and on their person, including in the form of calendar entries and location data.

Case 5:20-cr-00001-MWF  Document 1  Filed 12/05/19  Page 30 of 35  Page ID #:30
Case 5:19-mj-00651-DUTY *SEALED*  Document 1 *SEALED*  Filed 12/04/19  Page 14 of 29
Page ID #:14

e.    Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles in the event of an unexpected opportunity to sell narcotics arises.  Drug traffickers also commonly use their vehicles to meet with drug buyers, to transport drugs to and from drug stash locations, to conduct drug and cash exchanges, and to transport drug proceeds from transaction locations to stash locations and/or banks.

f.    Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis.  Such currency is often stored in their vehicles and on their person and records of such proceeds are often in their digital devices.

g.    Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence or in safes.  They also often keep other items related to their drug trafficking activities in their vehicles or on or near their person, such as digital scales, packaging materials, and proceeds of drug trafficking.  These items are often small enough to be easily hidden.

h.    It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as BlackBerry Messenger, WhatsApp, and the like, to cheap, simple, and often

13

prepaid flip phones, known colloquially as "drop phones," for actual voice communications. Also, I know that drug traffickers often use certain phones to communicate with certain people, for example drug buyers, and other phones for other people, such as suppliers, in order to segregate communications and make it more difficult for law enforcement to detect and track. Thus, I believe that there is probable cause that more digital devices than the SUBJECT TELEPHONE will be recovered in the requested search and contain evidence or be an instrumentality of the Subject Offenses.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[3]

35. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur

---

[3] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

14

Case 5:19-mj-00651-DUTY *SEALED*   Document 1 *SEALED*   Filed 12/04/19   Page 16 of 29
Page ID #:16

after a long period of time.  Similarly, files viewed on the
Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

b.   Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been
used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,
programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

c.   The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain

"booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

36.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.  Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.  Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

37.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following,

Case 5:19-mj-00651-DUTY *SEALED*   Document 1 *SEALED*   Filed 12/04/19   Page 18 of 29
Page ID #:18

which I know from my training, experience, and review of
publicly available materials:

      a.    Users may enable a biometric unlock function on
some digital devices.  To use this function, a user generally
displays a physical feature, such as a fingerprint, face, or
eye, and the device will automatically unlock if that physical
feature matches one the user has stored on the device.  To
unlock a device enabled with a fingerprint unlock function, a
user places one or more of the user's fingers on a device's
fingerprint scanner for approximately one second.  To unlock a
device enabled with a facial, retina, or iris recognition
function, the user holds the device in front of the user's face
with the user's eyes open for approximately one second.

      b.    In some circumstances, a biometric unlock
function will not unlock a device even if enabled, such as when
a device has been restarted or inactive, has not been unlocked
for a certain period of time (often 48 hours or less), or after
a certain number of unsuccessful unlock attempts.  Thus, the
opportunity to use a biometric unlock function even on an
enabled device may exist for only a short time.  I do not know
the passcodes of the devices likely to be found in the search.

      c.    Thus, the warrant I am applying for would permit
law enforcement personnel to, with respect to any device that
appears to have a biometric sensor and falls within the scope of
the warrant: (1) depress HILL's thumb- and/or fingers on the
device(s); and (2) hold the device(s) in front of HILL's face

with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

38.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII.  CONCLUSION

39.   For all of the reasons described above, there is probable cause to believe that HILL has committed a violation of 21 U.S.C. § 841(a)(1): Distribution of a Controlled Substance. There is also probable cause that evidence of the Subject Offenses, as described in Attachment B, will be found in a search of the SUBJECT VEHICLE and the person of HILL described in Attachments A-1 and A-2.

Lisa T. Boylan, Special Agent
Federal Bureau of
Investigation

Subscribed to and sworn before me
this 4th day of December, 2019.

HONORABLE SHERI PYM
UNITED STATES MAGISTRATE JUDGE